IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CRIMINAL NO.   EP-14-CR-2017-KC |
| ) | |
| FELICIA WALLER, ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS**

Comes now the United States of America, by and through the Acting United States Attorney for the Western District of Texas and the undersigned United States Attorney, and files its response to Defendant's Motion to Suppress, and would respectfully show the Court as follows:

## I.   SUMMARY OF THE FACTS

The Summary of Facts is taken from the reports of investigation that were supplied to **FELICIA WALLER,** the Defendant, in discovery and interviews with witnesses to the incident. The Government reserves the right to supplement the facts should additional information become known.

On September 25, 2014, El Paso Police Department ("EPPD") officers were on routine patrol in the area of the 6000 block of Dyer Street, El Paso, Texas when they observed a 2002 white Tahoe SUV traveling north on Dyer Street.  The white Tahoe SUV was speeding in violation of Texas law (53 mph in a 45 mph zone); in addition the officers also noted that the driver was using her cell phone, also in violation of Texas law.  The officers followed the

1

vehicle and made a traffic stop in the 9000 block of Dyer Street.  The vehicle was being operated by A. W. ("driver") who was accompanied by the defendant, Felicia Waller ("Defendant").  EPPD Officer Ibarra ("Ibarra") made contact with the driver and advised her why she had been stopped.  The other EPPD officer ("Granados") made contact with Defendant.  Officer Ibarra, who had previously dealt with the driver, remembered that she had outstanding warrants, asked the driver to step out of the vehicle and asked her if she had taken care of her outstanding warrants.  Officer Ibarra then requested a check for warrants for the driver and a check on Defendant.

As Officer Ibarra was talking to the driver of the vehicle, Officer Granados met with Defendant and asked her for her identification.  The Defendant provided a State of Texas ID and stated that she was the owner of the vehicle.  Officer Granados then asked for proof of financial responsibility for the vehicle.  The Defendant handed the officer her proof and seemed to Officer Granados to be in an agitated state, i.e. sighing and muttering under her breath.  Officer Granados asked Defendant if she was alright and Defendant asked why they were "messin with her?" and that she was tired of it.  The Defendant stated that she felt like she was being harassed by police officers because vehicles were being stopped leaving her residence.  The Defendant further stated, "Someone probably threw my name out there that's why you're watching me."  Officer Granados advised Defendant that he had never dealt with her before.  The Defendant then stated, "I'm not stupid I know I am being watched".  The Defendant then said to Officer Granados, "Let's go to my house right now and I'll let you guys search it.  You won't find anything.  I want to clear my name so you fools will leave me alone".  This exchange, between Officer Granados and the Defendant, occurred as Officer Ibarra was awaiting the results of the records check that he had requested.  Officer Granados called his supervisor

and informed the supervisor of what the Defendant had said. Officer Granados was then given permission to proceed to Defendant's residence to conduct a search of the residence. Officer Granados then asked the Defendant if she was willing to sign a consent form for her residence located at 10728 Texarkana, El Paso, Texas, which is located in the Western District of Texas. Officer Granados obtained a "consent to search" form from Officer Ibarra's duty bag. The Defendant was advised that this was a voluntary form and that she was in no way required to sign if she did not want to and that she was more than welcome to decline consent. The Defendant stated that she wanted to clear her name and signed the form.[1] All the EPPD officers followed the white Tahoe SUV, occupied by the driver and the Defendant to the Texarkana residence, and located approximately three to four miles away, where they were joined by an EPPD supervisor.

Before they began the search Granados again asked the Defendant if she was sure about the search and that she could withdraw her consent at any time, the Defendant replied that she understood. The Defendant was advised that she could follow them as they searched the house. The Defendant replied that she understood. Prior to entering the Defendant's residence, the Defendant removed a large dog from the house; the officers then entered a bedroom on the northeast side of the residence and were advised by the Defendant that it was her room. The Defendant remained in the room as the officers searched. Granados opened the top left drawer of a dresser and found a black Five Star bag. The bag was opened and was found to contain several 9 mm rounds. The Defendant was asked about the ammo in the bag and she replied,

---

1 Sometime during the encounter two other EPPD officers responded to assist at the scene of the traffic stop because a female EPPD officer was requested (since the persons encountered were females). The EPPD officers that responded were St. Louis and Ramos.

3

"That's my ammo, I go shooting at the range with a friend, and I use that ammo". Granados then saw an orange "Tang" box next to a TV stand/dresser. Granados opened the "Tang" box; inside were several shotgun shells. The Defendant was asked about the "Tang" box and she replied, "Those are mine also. What, is it illegal to own shotgun shells?" Granados asked the Defendant if she had ever been convicted of a felony. The Defendant replied, "that's done with." Granados advised the Defendant that the EPPD was going to seize the ammunition. The Defendant then replied to go ahead and, take it that if she was not supposed to have it then she did not want it in her house. Another officer conducted a search of the bathroom where, in the top left drawer of the bathroom counter, he located a plastic baggie containing one 9mm round.

The Five Star bag was found to contain a total of 31 rounds of 9mm ammunition of various manufacture, 1 round of .40 cal. ammunition and 12 rounds of 9mm hollow-point ammunition. The "Tang" box was found to contain 21 rounds of Remington 12 gauge ammunition. The various rounds of ammunition were seized by the EPPD and turned over to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

On November 5, 2014, the Defendant was charged in an Indictment with Felon in Possession of Ammunition, which is a violation of Title 18 U.S.C., Sections 922(g)(1) and 924(a)(2) and a warrant for her arrest was issued. On November 13, 2014, the Defendant was arrested, on the federal warrant, by officers of the EPPD.

## II. ISSUE

Defendant alleges that the Government violated the Defendant's Fourth, Fifth and Sixth Amendment rights and Defendant moves this Court to suppress any and all evidence seized pursuant to her detention.

### III. AUTHORITY AND ARGUMENT

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Thus, the Fourth Amendment protects an individual's reasonable expectation of privacy from certain types of government intrusion, such as searches and seizures conducted by law enforcement officials. *See Katz v. United States,* 389 U.S. 347, 350 (1967). Because virtually every governmental action interferes with personal privacy to some degree, the "[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250 (1991). What is reasonable under the Fourth Amendment is not subject to a precise definition and depends upon the circumstances and nature of the seizure. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 559 (1979).

The test for determining if a seizure (traffic stop) has exceeded the scope of a permissible stop is: 1) whether the officer's action was justified at its inception; and 2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place. *United States v. Jones*, 234 F.3d 234, 240 (5th Cir. 2000), referencing *Terry v. Ohio*, 392 U.S. 1 (1968).  The Defendant concedes that the traffic stop was justified at its inception; but argues that any further investigation was not reasonably related in scope to the circumstances that justified the stop in the first instance.  As such the focus is on the second prong of the test. That second prong looks at the police officers' actions in unreasonably extending the purpose of the initial stop.  Once the basis for the initial stop is discharged, unless the officer has a

5

reasonable suspicion supported by articulable facts that criminal activity may be afoot, there is no reason for continued detention. *Id*. at 240-41.

In the instant case, the EPPD officers were engaged in determining if the driver had warrants and if the Defendant was the owner of the vehicle and had proof of financial responsibility. It was during the examination of the Defendant's proffered documents that the Defendant offered to have the EPPD search her house. Officer Granados called his supervisor for permission to agree to the Defendant's request of a search of her house. Upon receiving permission to agree to the Defendant's request, Officer Granados confirmed the Defendant's consent by obtaining her signature on a consent to search form.

Defendant's assertion that there was an unreasonable extension of detention is misplaced for two reasons: 1) the request to search the Defendant's residence originated with the Defendant and was not the result of the police extending the traffic stop, and 2) the request from the Defendant for a search of her residence came while the police were still trying to determine if the driver of the white SUV had outstanding warrants and if the Defendant (the owner of the vehicle) had valid proof of financial responsibility. Therefore the EPPD officers' actions were consistent with the initial permissible scope of the stop and the test concerns itself with the actions taken by the police to unreasonably extend a traffic stop, not with actions taken by the person stopped to extend the traffic stop. Once the request for a search of her residence was made by the Defendant the remainder of the time spent at the scene was spent in confirming and memorializing her consent to search. After this process was concluded all parties went to the Defendant's residence to conduct the consent search.

The Fourth Amendment's test for a valid consent to search is that the consent be voluntary and "[v]oluntariness is a question of fact to be determined from all of the circumstances."

6

*Schneckloth v. Bustamante*, 412 U.S. 218, 248-49 (1973). To determine voluntariness, the 5th Circuit uses a six-factor test: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. All six factors are relevant, but no single one is dispositive or controlling. *United States v. Freeman*, 482 F.3d 829 (5th Cir.), *cert. denied*, 552 U.S. 883 (2007).  A review of the six factors weighs strongly in favor of the Government's reliance on the Defendant's consent to search her residence.

First, the Defendant herself voluntarily extended her custodial status (which was justified at its inception) by requesting a search of her residence; such a request entailed the execution of a written consent to search form and its attendant procedural aspects.  Second, there is no allegation that the police officers engaged in any coercive procedures (beyond the allegation that they extended the valid traffic stop).  Third, the Defendant's initial oral and then written consent to the search of her residence is evidence of her high level of cooperation with the police.  Fourth, the Defendant signed a written consent to search which informed her of her right to refuse; the Defendant was again informed of her right to refuse when she and the EPPD officers arrived at her residence.  Fifth, the Defendant has not alleged any mental disorders or lack of intelligence.  Six, the Defendant's statement, "You won't find anything" at the time she requested a search of her residence indicates a confident belief on the part of the Defendant that no incriminating evidence would be found at her residence.  In sum, all six factors strongly support the conclusion that the Defendant's consent to search her residence was freely and voluntarily given.

A further point to be made is that consistent with the "fruit of the poisonous tree" doctrine, "all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." *Jones* at 243-44, citing *U.S. v. Rivas*, 157 F.3d 364, 365 (5th Cir. 1998).   After the Defendant executed the written consent to search at the scene of the traffic stop, she and A.W. (the driver of the white SUV) proceeded in the white SUV to the Defendant's residence.  The Defendant's residence is approximately three to four miles from the location of the traffic stop.   Upon arrival at the Defendant's residence, she was again asked if she was sure of her consent to search and that she could withdraw her consent at any time.   The Defendant replied that she understood and allowed the EPPD officers to enter her residence after she had removed her dog.

The time to travel to the Defendant's residence, the distance from the location of the traffic stop to the Defendant's residence and the reaffirmation of the Defendant's consent to search constitute evidence of a clear break in the chain of events to refute any inference or allegation of a Fourth Amendment violation at the scene of the traffic stop.

## IV. CONCLUSION

Since the initial traffic stop was justified and since any delay in extending the length of the stop resulted from the Defendant's actions and not by the EPPD there is no Fourth Amendment violation.   In addition the Defendant's oral and written consent to search justifies the EPPD officers' actions in conducting a search of the Defendant's residence.

WHEREFORE, PREMISES CONSIDERED, the Government respectfully requests that the Defendant's Motion to Suppress be denied in its entirety.

        Respectfully submitted,

        RICHARD L. DURBIN, JR.
        ACTING UNITED STATES ATTORNEY

By:   _____
        CARLOS G. HERMOSILLO
        Assistant U.S. Attorney
        Texas Bar #09514450
        700 E. San Antonio, Suite 200
        El Paso, Texas   79901
        (915) 534-6884

## CERTIFICATE OF SERVICE

This is to certify that on 2ND day of March, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Leonard Morales
Attorney for Defendant

        _____/s/_____
        CARLOS G. HERMOSILLO

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>FELICIA WALLER, )<br>)<br>Defendant. ) | CRIMINAL NO.   EP-14-CR-2017-KC |

## **ORDER**

On this day, came to be considered Government's Response to Defendant's Motion to Suppress and the Court having considered same, is of the opinion that Defendant's Motion to Suppress Evidence should be denied.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress is hereby DENIED.

SIGNED AND ENTERED this _____ day of March, 2015.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE